**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

GARY W. RICH, et al.,

                Plaintiffs,

v.                                    CIVIL ACTION NO.   2:19-cv-00290

FIRST MERCURY INSURANCE COMPANY, et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are cross-motions for summary judgment filed by Defendant First Mercury Insurance Company ("First Mercury"), (ECF No. 15), and Plaintiffs Gary Rich and the Law Office of Gary W. Rich, L.C. (collectively "Mr. Rich," unless otherwise indicated).   (ECF No. 17.)   For the reasons more fully explained below, First Mercury's motion for summary judgment, (ECF No. 15), is **GRANTED**, and Mr. Rich's motion for summary judgment, (ECF No. 17), is **DENIED**.

*I.    BACKGROUND*

This action arises out of a dispute between a professional liability insurance carrier and an attorney about the insurance carrier's duty to defend a prior lawsuit.   Plaintiff Gary Rich is an attorney who was admitted to the Bar of the State of West Virginia in 1980 and was licensed to practice law in the state from the mid-1990s until 2011.   (ECF No. 18 at 2.)   He is also the president of the Law Office of Gary W. Rich, L.C., in Monongalia County, West Virginia, where

1

he practiced law during this same period.   (*Id.*)   Defendant First Mercury is a Delaware Corporation with its principal place of business in Southfield, Michigan, and operates as a surplus lines insurer in all fifty states.   (*Id.*)

A.   *The Insurance Policy*

First Mercury issued a Lawyers Professional Liability Insurance Policy, Policy Number FMLP002987 (the "Policy"), to the Law Office of Gary W. Rich, L.C. as the named insured in 2009.   (*Id.*)   Gary Rich was also an insured under the Policy.   (*Id.* at 3.)   The Policy was written on a "Claims Made" basis, as opposed to an "Occurrence" basis.   (ECF No. 15 at 10.) The policy period ran from December 1, 2009 to December 1, 2010, and pursuant to its terms, only covered claims first made against an insured during the policy period and reported to First Mercury.   (*Id.* at 10–11.)   The Policy was amended via an "Extended Reporting Period Endorsement" that applied to attorneys who ceased the practice of law, such as Mr. Rich.   (*Id.* at 11; ECF No. 15-19 at 2; ECF No. 18 at 2–3.)   Pursuant to that Endorsement, claims made during the extended reporting period—in other words, after December 1, 2010—would be deemed to have been made on the last day of the Policy period, subject to the other requirements of the Policy. (ECF No. 15 at 11; ECF No. 15-19 at 2.)

In pertinent part, the insuring agreement of the Policy states as follows:

The Company shall pay on behalf of any INSURED all DAMAGES in excess of the deductible which any INSURED becomes legally obligated to pay as a result of CLAIMS first made against any INSURED during the POLICY PERIOD and reported to the Company in writing during the POLICY PERIOD or within sixty(60) days thereafter, by reason of any WRONGFUL ACT occurring on or after the RETROACTIVE DATE, if any. Coverage shall apply to any such CLAIMS arising out of the conduct of the INSURED'S profession as a Lawyer, or as a Lawyer acting in the capacity of an Arbitrator, Mediator, Neutral, Title Insurance Agent, Notary Public, member, director, office of any Bar Association, its governing board or any of its committees, or as a member of a formal accreditation,

2

ethics, peer review, licensing board, standards review or similar professional board
or committee relating to the practice of law.

(ECF No. 15-19 at 18 (emphasis in original).)

The Policy defines numerous terms, several of which are critical to the adjudication of

these motions.   First, the Policy defines a "claim" as follows:

CLAIM means a demand made upon any INSURED for DAMAGES, including,
bit [*sic*] not limited to, service [*sic*] suit or institution of arbitration proceedings
against any INSURED.

(*Id.* at 19; ECF No. 17-2, Ex. 1-A at 6.)   "Damages" is also defined by the Policy, in relevant part:

DAMAGES means the monetary and compensatory portion of any judgment,
award or settlement, provided always that DAMAGES shall not include:

* * *

E.      the return of [*sic*] forfeiture of fees paid to the INSURED for
PROFESSIONAL SERVICES;

(ECF No. 15-19 at 11; ECF No. 17-2, Ex. 1-A at 18.)   Next, and in relevant part, the Policy defines

"professional services," as follows:

PROFESSIONAL SERVICES means any services arising out of the conduct of the
INSURED'S profession as a Lawyer[.]

(ECF No. 15-19 at 20; ECF No. 17-2, Ex. 1-A at 7.)   Finally, the Policy defines the term "wrongful

act":

WRONGFUL ACT(S) means any actual or alleged:

A. act;
B. error;
C. omission;
D. misstatement;
E. misleading statements;
F. neglect or breach of duty; or
G. personal injury.

3

(ECF No. 15-19 at 20; ECF No. 17-2, Ex. 1-A at 7.)   With the essential terms of the Policy established, the Court will now recount the litigation that preluded the current action.

    *B.*    *The Simoni Litigation*

On January 13, 2012, Mr. Rich, by counsel, filed an action for a declaratory judgment (the "Simoni Litigation") in the United States District Court for the Northern District of West Virginia against Joseph Simoni, Ph.D ("Dr. Simoni").[1]   (ECF No. 18 at 4.)   Dr. Simoni had assisted Mr. Rich in the investigation and prosecution of several lawsuits in Fairmont and Spelter, West Virginia (the "Fairmont and Spelter litigation").   (*Id.*; ECF No. 16 at 1.)   These lawsuits were settled in January 2008 and November 2010, respectively.   (ECF No. 18 at 4.)   A dispute subsequently arose between Mr. Rich and Dr. Simoni regarding Dr. Simoni's compensation for the services he provided in that prior litigation.   (ECF No. 16 at 1; ECF No. 18 at 4.)   Mr. Rich eventually initiated a declaratory judgment action against Dr. Simoni, in which Mr. Rich sought a declaration that Dr. Simoni was not entitled to any compensation from Mr. Rich for the services provided in the Fairmont and Spelter litigation.   (ECF No. 16 at 1–2; ECF No. 18 at 4.)   Mr. Rich was eventually successful in this litigation.   (ECF No. 16 at 2.)

During the declaratory judgment action, Dr. Simoni filed a counterclaim against Mr. Rich. (ECF No. 16 at 2; ECF No. 18 at 5.)   The counterclaim asserted causes of action for quantum meruit, unjust enrichment, breach of implied contract, negligent misrepresentation, conversion, and estoppel.   (ECF No. 18 at 5.)   In response to this counterclaim, Mr. Rich filed third-party complaints against three law firms (the "third-party law firms") that had served as co-counsel with

---

[1] The style of that action is Rich, et al. v. Simoni, Civil Action No. 1:12-cv-12.

Mr. Rich during the Fairmont and Spelter litigation.   (*Id.* at 5–6.)   Each law firm subsequently

filed its own counterclaims against Mr. Rich in response.[2]   (*Id.*)

    *C.*    *The Current Dispute*

The current dispute between Mr. Rich and First Mercury arises out of the declaratory

judgment action against Dr. Simoni.   At issue is whether First Mercury was obligated to provide

Mr. Rich with a legal defense for the counterclaims asserted against him by Dr. Simoni and the

third-party law firms.   The following is the relevant timeline of events that ultimately led to the

current dispute between the parties.

Before the litigation between Mr. Rich and Dr. Simoni began in earnest, Dr. Simoni,

through counsel, sent a demand letter to Mr. Rich on March 26, 2010.   (ECF No. 15–12; ECF No.

16 at 13.)   Mr. Rich was out of the country when this letter was sent, but after learning of it,

discussed its contents with his personal counsel.   (ECF No. 20 at 11.)   Mr. Rich and his counsel

did not respond to this letter because Dr. Simoni would be an important witness in any potential

retrial of the Spelter matter, and they did not want there to be anything that might threaten his

credibility.   (*Id.* at 12.)

Dr. Simoni again sent a demand letter in November 2011 and attached two draft complaints

asserting various causes of action against Mr. Rich.   (*Id.*)   Mr. Rich was in Saudi Arabia at the

time, and therefore did not become aware of the letter until approximately December 19, 2011.

(*Id.*)   Mr. Rich had the letter forwarded to his personal attorney, who reviewed the letter and draft

complaints on December 21, 2011.   (*Id.*)   Mr. Rich and his attorney discussed the letter on

---

[2] The law firms' counterclaims asserted causes of actions for breach of contract, indemnification, contribution, fraud, and unjust enrichment.   (ECF No. 15 at 8–9.)

December 30, 2011.  (*Id.*)   Thereafter, Mr. Rich filed a complaint for declaratory judgment against Dr. Simoni on January 13, 2012.  (*Id.* at 13.)

Dr. Simoni, as previously noted, filed a counterclaim in that action on April 26, 2012.  (*See* ECF No. 18 at 5.)   Following Dr. Simoni's counterclaim, Mr. Rich's counsel attempted to notify First Mercury of the counterclaim by faxing a letter on April 27, 2012 to the fax number set forth in the Policy.  (ECF 20 at 13; ECF No. 15–13.)   First Mercury, however, never received this letter.  (ECF No. 16 at 15.)   In fact, the fax confirmation page indicates an error in transmission and that the fax was not sent.  (ECF No. 21-1.)

Then, following the counterclaims asserted by the third-party defendant law firms, Mr. Rich's counsel again reported the counterclaims to First Mercury on February 28, 2013.[3]  (ECF No. 20 at 13; ECF No. 21 at 9.)   On April 29, First Mercury's claim administrator acknowledged receipt of the notice of claims sent on February 28.  (ECF No. 20 at 13; ECF No. 21 at 9.)   The claims administrator, however, denied coverage for the counterclaims, stating that "[t]he Simoni dispute does not arise out of conduct of the Insured's profession as a Lawyer, but rather involves a business dispute over the division of fees."  (ECF No. 20 at 14; ECF No. 17–3 at 6.)

On May 1, 2015, Judge Keeley granted summary judgment in favor of Mr. Rich and the law firms regarding Dr. Simoni's claims.  (ECF No. 15–16.)   Then, on January 20, 2016, the third-party law firms filed a consolidated Amended Counterclaim against Mr. Rich.  (ECF No. 15–11.)   This consolidated counterclaim asserted two claims for breach of contract and one for

---

[3] There appears to be some dispute over the appropriate fax number for First Mercury.   Mr. Rich seems to imply that the number used by his personal counsel was changed at some point in time, of which alleged change Mr. Rich did not receive notice.  (ECF No. 20 at 13.)   Mr. Rich also identifies that the number provided by First Mercury's claims administrator lists a different fax number than the Policy.  (ECF No. 17–3 at 7.)   First Mercury, however, maintains the number was never changed, and that First Mercury "clearly" received this later fax "because [First Mercury] acknowledged receipt of it on April 29, 2013."  (ECF No. 21 at 10.)

implied indemnity for attorney fees resulting from the Fairmont and Spelter litigation.   (ECF No. 15–11 at 11–18.)   On March 18, 2016, Mr. Rich and the third-party law firms agreed to a mutual dismissal with prejudice regarding all claims asserted against each other.   (ECF No. 15–17.)   Mr. Rich did not pay anything in settlement funds to any party.   (ECF No. 16 at 2.)

    D.    *Procedural History*

Mr. Rich initiated this action in the Circuit Court of Kanawha County on March 15, 2019. (ECF No. 1–1.)   Mr. Rich asserted one cause of action against First Mercury, a breach of the insurance contract.   (*Id.* at 8.)   On April 17, 2019, First Mercury removed the action to this Court. (ECF No. 1.)   On April 23, First Mercury filed its answer to Mr. Rich's complaint, along with a counterclaim against Mr. Rich.   (ECF No. 3.)   The counterclaim seeks a declaratory judgment that the Policy provides no insurance coverage to Mr. Rich for the counterclaims asserted against him in Civil Action No. 1:12-cv-00012.   (ECF No. 3 at 11.)

The parties filed their cross motions for summary judgment on February 6, 2020.   (*See* ECF Nos. 15, 17.)   First Mercury timely responded on February 12, (ECF No. 19), and Mr. Rich timely responded on February 20.   (ECF No. 20.)   The parties then each replied to the respective responses on February 27, 2020.   (ECF Nos. 21, 22.)   As such, these motions are fully briefed and ripe for adjudication.

## II.    *LEGAL STANDARD*

Rule 56 of the Federal Rules of Civil Procedure states, in pertinent part, that a court should grant summary judgment if "there is no genuine issue as to any material fact."   "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News &*

*Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). Summary judgment should not be granted if there are factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted). The nonmoving party bears the burden of showing there is a "genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence[.]'" *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). When ruling on a motion for summary judgment, the Court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). "Contract interpretation is a subject particularly suited for summary judgment disposal." *Bank of Montreak v. Signet Bank*, 193 F.3d 818, 835 (4th Cir. 1999) (citing *Metalex Corp. v. Uniden Corp. of Am.*, 863 F.2d 1331, 1333 (7th Cir.1988)). *See also Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1, 6 (W. Va. 1998) (stating "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination ....") (internal citation omitted). However, it has also been observed that "[a]n ambiguous contract that cannot be resolved by credible, unambiguous, extrinsic evidence discloses genuine issues of material fact ... [and] summary judgment is inappropriate." *Sempione v. Provident Bank*, 75 F.3d 951, 959 (4th Cir. 1996).

### III.   DISCUSSION

The parties' cross motions for summary judgment require the determination of whether First Mercury breached an insurance contract with Mr. Rich when it refused to provide liability insurance coverage for counterclaims asserted against Mr. Rich in a prior lawsuit that was initially filed by Mr. Rich.   More simply, the Court must determine whether First Mercury had a duty to defend under the terms of the Policy.[4]   In support of his motion for summary judgment, Mr. Rich argues that First Mercury breached its duty to defend when it denied coverage for the four counterclaims filed against him in that prior action.   (*See* ECF No. 18 at 7.)   Conversely, First Mercury argues that the counterclaims asserted against Mr. Rich were not covered under the Policy, and therefore precluded coverage, for three reasons.   First, First Mercury argues that the counterclaims did not "arise out of the conduct" of Mr. Rich's profession as an attorney, but rather out of his "business."   (ECF No. 16 at 6.)   Second, First Mercury argues that the counterclaims asserted against Mr. Rich do not seek damages as defined by the Policy, but instead only seek the splitting of legal fees pursuant to a professional agreement.   (*Id.* at 11.)   Finally, First Mercury argues that, even if this Court were to find against First Mercury on its first two arguments, Mr. Rich failed to abide by conditions precedent to coverage by failing to timely notify First Mercury of the claims asserted against him.   (*Id.* at 13.)   With the understanding that Mr. Rich's argument is necessarily interwoven with and dependent on the resolution of First Mercury's arguments, the Court will undertake its review in the order presented by First Mercury.

Before the Court engages in this analysis, a brief review of the law of contract interpretation specific to insurance policies in West Virginia is needed.   First Mercury removed this case on the

---

[4] Because the Plaintiffs, both Mr. Rich individually and the Law Office of Gary W. Rich, did not have a judgment entered against them in Civil Action No. 1:12-cv-00012, only the duty to defend is implicated here.

basis of diversity jurisdiction.   (ECF No. 1.)   In cases based on diversity jurisdiction, a federal

court is "obliged to apply the substantive law of the state in which it sits."   *Volvo Constr. Equip.*

*N. Am. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 599–600 (4th Cir. 2004) (citing *Erie R.R. Co. v.*

*Tompkins*, 304 U.S. 64, 79 (1938)).   There is no dispute between the parties that West Virginia

substantive law applies.   (ECF No. 16 at 5; ECF No. 18 at 7.)

In West Virginia, language in an insurance policy should be given its plain, ordinary

meaning.   *Aluise v. Nationwide Mut. Fire Ins. Co.*, 625 S.E.2d 260, 267–68 (W. Va. 2005).

"Where the provisions of an insurance policy contract are clear and unambiguous they are not

subject to judicial construction or interpretation, but full effect will be given to the plain meaning

intended."   Syl. Pt., *Keffer v. Prudential Ins. Co. of America*, 172 S.E.2d 714, 714 (W. Va. 1970).

"As a general rule, an insurer's duty to defend is tested by whether the allegations in the plaintiff's

complaint are reasonably susceptible of an interpretation that the claim may be covered by the

terms of the insurance policy."   *Aetna Cas. & Sur. Co. v. Pitrolo*, 342 S.E.2d 156, 160 (W. Va.

1986).   Because insurance policies are prepared by insurers, "any ambiguities in the language of

insurance policies must be construed liberally in favor of the insured."   *Id.*   Regardless of the

ambiguity or lack thereof in a policy, however, "[a]n insurance company seeking to avoid liability

through the operation of an exclusion has the burden of proving the facts necessary to the operation

of that exclusion."   *State ex rel. Nationwide Mut. Ins. Co. v. Wilson*, 778 S.E.2d 677, 685 (W. Va.

2015).

With this foundation in mind, the Court begins with the question of whether the

counterclaims brought against Mr. Rich by Dr. Simoni and the third-party law firms "arose out of

the conduct" of Mr. Rich's profession as an attorney.

### A.     Arising out of Conduct of the Insured's Profession as a Lawyer

First Mercury argues that, by the terms of the Policy, the counterclaims asserted against Mr. Rich do not state claims that arise out of the conduct of Gary Rich's profession as a lawyer. (ECF No. 16 at 6.)   First Mercury argues that, in analogous cases, the West Virginia Supreme Court of Appeals has found that "professional services" is defined to mean the services rendered by someone with a particularized knowledge or skill, which clearly contrasts with the general business aspect of a law firm.   (*Id.* at 7–8.)   Because the counterclaims asserted against Mr. Rich involve the business of his law firm, and not the actual practice of law, First Mercury asserts that the Policy's explicit terms exclude coverage.   (*Id.* at 8–11.)

Mr. Rich, in response, argues that the Policy includes broad language that mandates coverage: Namely, that the phrase "arising out of" should be read expansively.   (ECF No. 20 at 2.)   Mr. Rich also argues that First Mercury's reliance on the definition of "professional services" is misplaced, as that language does not appear in the insuring clause of the Policy.   (*Id.* at 4.)   Moreover, Mr. Rich asserts that First Mercury drafted the Policy, and if it intended to exclude claims from coverage that involved the division of professional fees, it could have done so.   (*Id.* at 6–7.)   Therefore, Mr. Rich contends that the clear, broad language of the insuring clause provides coverage.

As already established, an insurer's duty to defend "is tested by whether the allegations in the plaintiff's complaint are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy."   *Pitrolo*, 342 S.E.2d at 160.   Stated differently, an insurer has a duty to defend "if the claim stated in the underlying complaint could, without amendment, impose liability for risks the policy covers."   *Bowyer v. Hi–Lad, Inc.*, 609 S.E.2d

895, 912 (W. Va. 2004).   The duty to defend may also be broader than an obligation to pay under

a policy.   *Pitrolo*, 342 S.E.2d at 160.   *See also Butts v. Royal Vendors, Inc.*, 504 S.E.2d 911, 916

(W. Va. 1998) ("When there is any question about an insurer's duty to defend under an insurance

policy, such question 'must be construed liberally in favor of an insured.'").   "[A]n insurer must

meet a rigorous standard to avoid its obligation to defend."   *Id.* at 914.

> Relevant here, the Policy's "insuring clause" reads:

> Coverage shall apply to any such CLAIMS arising out of the conduct of the
> INSURED'S profession as a Lawyer[.]

(ECF No. 15-19 at 18.)   First Mercury argues that its duty to defend is not triggered because the

counterclaims asserted against Mr. Rich are not a result of his profession as a lawyer, but rather

are simply related to "running the business" of a law firm.   (*See* ECF No. 19 at 3–10.)   Mr. Rich,

however, focuses on the language "arising out of" in the above insuring clause to argue that the

broad language mandates coverage of the counterclaims.   (ECF No. 18 at 9.)

> On this issue, this Court is in agreement with Mr. Rich.   While the Supreme Court of

Appeals of West Virginia has not, to this Court's knowledge, ever addressed the meaning of the

phrase "arising out of," other jurisdictions have broadly construed this language.   *See, e.g.*,

*Westport Ins. Corp. v. Bayer*, 284 F.3d 489, 497 (3d Cir. 2002) ("[L]anguage in a professional

liability policy stating that the insurer will cover all injuries 'arising out of' the rendering or failure

to render professional services, and will defend 'any' suit against the insured seeking such

damages, signals that the coverage is to be broadly construed."); *American States Ins. Co. v. Bailey*,

133 F.3d 363, 370 (5th Cir. 1998) ("This court has held that the words 'arising out of,' when used

within an insurance policy, are broad, general, and comprehensive terms effecting broad coverage.

The words are 'understood to mean originating from, having its origin in, growing out of or flowing

from.") (internal quotations omitted).   Indeed, even if the Supreme Court of Appeals has not directly addressed this language, several decisions indicate that it would broadly construe the phrase.   *See, e.g.*, *Baber v. Fortner ex rel. Poe*, 412 S.E.2d 814, 817 (W. Va. 1991) (noting that "the phrase 'arising out of the ownership, maintenance or use' in automobile insurance policies has been given a broad interpretation"); *Huggins v. Tri–Cnty. Bonding Co.*, 337 S.E.2d 12, 17 (W. Va. 1985) (noting the absence of "any expansive language such as . . . the phrase 'arising out of'"). The federal courts in West Virginia are also in agreement that the phrase "arising out of" is to be broadly construed.   *See, e.g.*, *Norfolk Southern Ry. Co. v. Nat'l Union Fire Ins. of Pittsburgh, PA*, 999 F.Supp.2d 906, 912–13 (S.D. W. Va. 2014) (noting that the phrase "arising out of" does not require a "direct proximate causal connection" but rather means "flowing from" or "having its origins in"); *Nutter v. St. Paul Fire & Marine Ins. Co.*, 780 F.Supp.2d 480, 483 (N.D. W.Va. 2011).

In the Simoni Litigation, Dr. Simoni asserted claims for quantum meruit, unjust enrichment, breach of implied contract, negligent misrepresentation, conversion, and estoppel. (ECF No. 18 at 5.)   These claims originated from services that Dr. Simoni provided to Mr. Rich during the Fairmont and Spelter actions.   Similarly, the third-party law firms in the Simoni Litigation asserted two claims for breach of contract and one for implied indemnity for attorney fees resulting from the Fairmont and Spelter actions.   Mr. Rich represented those Fairmont and Spelter clients as their lawyer.   Dr. Simoni's claims, and those of the third-party law firms, alleged a contractual relationship with Mr. Rich that arose from Mr. Rich's representation of the Fairmont and Spelter clients and the professional legal services he provided.   The counterclaims asserted, then, certainly flow from and have their origins in Mr. Rich's conduct as an attorney and the services he provided as an attorney over the course of the Fairmont and Spelter actions.   The

13

disputes between Mr. Rich, Dr. Simoni, and the third-party law firms, then, are "reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy." *See Pitrolo*, 342 S.E.2d at 160.   Therefore, the claims asserted against Mr. Rich arose out of Mr. Rich's conduct in his profession as a lawyer.

First Mercury urges this Court, however, to find that these claims, rather than "arising out of" Mr. Rich's conduct in his profession as a lawyer, are instead mere business disputes resulting from the actual business operations of the law firm.   In support of this argument, First Mercury directs the Court to *Boggs v. Camden-Clark Memorial Hosp. Corp.*, 693 S.E.2d 53 (W. Va. 2010). In *Boggs*, the Supreme Court of Appeals examined a General Commercial Liability insurance policy that contained an exclusion for claims caused by the rendering or failure to render of "professional services."   *Id.*   First Mercury relies on the following passage, where the Supreme Court highlighted the different aspects of the practice of law:

> The professional aspect of a law practice obviously involves the rendering of legal advice to and advocacy on behalf of clients for which the attorney is held to a[sic] certain minimum professional and ethical standards. The commercial aspect involves the setting up and running of a business, i.e., securing office space, hiring staff, paying bills and collecting on accounts receivable, etc., in which capacity the attorney acting as businessperson is held to the same reasonable person standard as any other.

*Id.* at 60–61 (quoting *Harad v. Aetna Casualty and Surety Co.*, 839 F.2d 979, 985 (3rd Cir.1988) (error in original)).   Relying on this language, First Mercury argues that the counterclaims asserted against Mr. Rich originated from the operation of his law firm as a business and not his professional conduct as a lawyer.

Even if the Supreme Court of Appeals has recognized the difference between "professional services" and those services routine to the operation of a business, *Boggs* is of little use to the

14

Court on this issue.   First, the insurance policy at issue in *Boggs* was a general business policy with a professional services exclusion.   *Id.* at 58.   In the case at hand, the Court is faced with a professional liability policy with a broad insuring clause.   As noted previously, an insurer faces a rigorous standard to avoid its obligation to defend, and if the claims are reasonably susceptible of an interpretation leading to coverage, then the question of whether coverage applies should be interpreted liberally in favor of the insured.   *See Butts*, 504 S.E.2d at 916.   In this dispute, the expansive reading of the insuring clause, as opposed to a narrow exclusion, indicates that the counterclaims would be reasonably susceptible to an interpretation that the claims are covered.

Furthermore, the *Boggs* Court specifically held that "[t]he term 'professional services' contained in a commercial general liability policy, *when not otherwise specifically defined*, denotes those services rendered by someone with particularized knowledge or skill in his or her chosen field."   Syl. Pt. 1, *Id.* at 55 (emphasis added).   Here, however, "professional services" is defined by the Policy.[5]   But even that is of little import to the Court in interpreting the insuring clause because the term "professional services" does not appear anywhere in the insuring clause.   (*See* ECF No. 15-19 at 18.)   This alone is ultimately fatal to First Mercury's argument, as the Court will not "rewrite the terms of the policy; instead, [it] enforce[s] it as written."   *Payne v. Weston*, 466 S.E.2d 161, 165 (W. Va. 1995).   As written, the phrase "arising out of" is broader than First Mercury argues, such that it would encompass the counterclaims asserted against Mr. Rich.

For the foregoing reasons, this Court concludes that First Mercury cannot deny coverage under the Policy because the claims asserted against Mr. Rich arose out his conduct in his profession as a lawyer.   This conclusion alone, however, is not dispositive of the overall issue of

---

[5] The Policy defines "professional services" as "any services arising out of the conduct of the INSURED'S profession as a Lawyer[.]"   (ECF No. 15-19 at 20; ECF No. 17-2, Ex. 1-A at 7.)

whether First Mercury breached its duty to defend.   Therefore, the Court looks to First Mercury's next argument.

      *B.*     *The Policy's Damages Exclusion*

First Mercury next argues that the Policy's damages exclusion applies to the counterclaims asserted against Mr. Rich, thereby excluding these claims from coverage.   (ECF No. 16 at 11–12.)   First Mercury argues that this exclusion clause explicitly excludes "the return or forfeiture of fees paid to the INSURED for PROFESSIONAL SERVICES."   (*Id.* at 12.)   First Mercury asserts that the relief sought by Dr. Simoni against Mr. Rich was for a portion of the attorney fees Mr. Rich received from the Fairmont and Spelter litigation.   (*Id.*)   Therefore, First Mercury argues that the Policy is not triggered because the damages sought are in fact fees for Mr. Rich's professional services.

Mr. Rich counters that the language that First Mercury relies on—the "return or forfeiture of fees"—does not apply to the claims asserted against him.   (ECF No. 20 at 8.)   Furthermore, Mr. Rich argues that First Mercury has not directed the Court to any precedent, controlling or persuasive, that would support its argument that the relief sought by Dr. Simoni effectively denies Mr. Rich a defense to the claims.   (*Id.*)   Finally, Mr. Rich asserts that even if the damages exclusion applies to the claims against him, First Mercury would still have a duty to defend.   (*Id.* at 9.)   Thus, the exclusion would only apply to any damages awarded to Dr. Simoni or the third-party law firms, but would still require First Mercury to defend the case.

In West Virginia, "an insurer's duty to defend is broader than its duty to indemnify." *Camden-Clark Memorial Hosp. Ass'n v. St. Paul Fire and Marine Ins. Co.*, 682 S.E.2d 566, 575 (W. Va. 2009).   Furthermore, "[a]n insurance company seeking to avoid liability through the

operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion." Syl. pt. 7, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 356 S.E.2d 488 (W. Va. 1987), *overruled on other grounds by Parsons v. Halliburton Energy Services, Inc.*, 785 S.E.2d 844 (W. Va. 2016). "Where the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated." Syl. Pt. 7, *First Mercury Ins. Co. v. Russell*, 806 S.E.2d 429 (W. Va. 2017).

As previously explained, First Mercury must meet a high standard for the exclusion to apply. *See Butts*, 504 S.E.2d at 914. Simply, if there is any question about First Mercury's duty to defend under the Policy, then the question "must be construed liberally in favor of the insured." *Pitrolo*, 342 S.E.2d at 160. Here, First Mercury has failed to carry that burden sufficiently to convince the Court that there is no question regarding the damages exclusion.

To begin, First Mercury has not directed the Court to any authority on the interpretation of the phrase "return or forfeiture of fees." Nor does the Policy itself contain a definition for the phrase. Plaintiff, meanwhile, has directed the Court to a decision from the Eastern District of Missouri, where the district court reasoned that an exclusion under a similarly-worded phrase— "return or restitution of legal fees"—did not excuse an insurer from its duty to defend under an insurance contract where the plaintiff was not seeking the "return" fees. *See Hullverson Law Firm v. Liberty Ins. Underwriters, Inc.*, 25 F.Supp.3d 1185 (E.D. Mo. 2014) (finding that, in underlying action, "profits and advantages" gained by law firm through alleged false and misleading advertising did not constitute the "return" of legal fees). Indeed, even while finding that some of the damages claimed in that case would be excluded, the fact that some damages were ultimately

not excluded triggered the insurer's duty to defend.    *Id.* at 1196.    While not controlling, *Hullverson* does provide the Court insight on the exclusion clause at issue here.

For example, in Count I (quantum meruit) of Dr. Simoni's amended complaint, Dr. Simoni sought "reasonable compensation" in return for services he rendered in assisting Mr. Rich.   (ECF No. 15–5 at 24.)   Similarly, in Count II (unjust enrichment), Dr. Simoni sought "damages based upon the reasonable value of his time and effort expended."   (*Id.* at 25–26.)   While a reasonable debate may be had as to the actual character of these payments, this Court cannot conclude that the exclusion position advanced by First Mercury succeeds here.   The phrase "return or forfeiture of fees" is not defined, and while the lack of a definition does not automatically result in ambiguity, the Court is required to apply the "plain and ordinary meaning."   *See Blake v. State Farm Mut. Auto. Ins. Co.*, 685 S.E.2d 895, 900–01 (W. Va. 2009).

Common sense dictates that Dr. Simoni was not seeking the "return" of fees that he had paid to Mr. Rich.   Thus, the question focuses on whether Mr. Rich was "forfeiting" fees paid to him to Dr. Simoni.   First Mercury argues that "forfeiture" means "the loss of property or money because of a breach of a legal obligation," and that is precisely what Dr. Simoni is claiming: The forfeiture—to Dr. Simoni—of fees paid to Mr. Rich for professional services performed by Mr. Rich in his role as an attorney. (ECF No. 21 at 7.)   Rather, Mr. Rich argues that this clause means the forfeiture of fees paid by a client for Mr. Rich's services to that specific client.   (*See* ECF No. 22 at 4–5 ("Forfeiture of an attorney's fees is a remedy only available to his or her client.").)   Yet, this Court is convinced that First Mercury has failed to meet the rigorous standard required of it for the exclusion to apply.   Dr. Simoni arguably claimed damages that would fall outside of the exclusion, and the Court believes there to be a reasonable interpretation of these claims for

damages such that the counterclaims would be covered by the Policy.   While these claims may not be subject to a duty to indemnify, this Court finds that these claims for damages do trigger the duty to defend.

Because a reasonable question exists as to the interpretation of the exclusion clause and the relief sought by Dr. Simoni, the Court must construe this clause liberally and in favor of the insured, Mr. Rich.   For those reasons, First Mercury's argument fails.   Still, First Mercury advances one more argument in defending its denial of coverage, which the Court takes up next.

C.     *Conditions Precedent to Coverage*

First Mercury's final argument is that, in failing to timely provide notice of Dr. Simoni's claims to First Mercury, Mr. Rich did not satisfy conditions precedent as dictated by the Policy to trigger coverage.   (ECF No. 16 at 13.)   Essentially, First Mercury argues that the delay in notifying it of the claims asserted against Mr. Rich was unreasonable, whether notice was found to be given in April of 2012 or February of 2013.   (*See, e.g.*, ECF No. 21 at 9–10.)   This unreasonable delay resulted in prejudice to First Mercury, through "more than a year of litigation" taking place without First Mercury's knowledge; the hiring of expensive attorneys; and "soar[ing]" litigation costs.   (ECF Nos. 16 at 19, 21 at 14.)   For those reasons, First Mercury asserts that Mr. Rich violated conditions precedent to coverage such that the Court must find that no breach of the insurance agreement occurred.

Conversely, Mr. Rich argues that notice was given, but that First Mercury may have changed the facsimile number without notice.   (ECF No. 20 at 13.)   Further, Mr. Rich argues that a determination of reasonableness is a question of fact for a jury.   (*Id.* at 11.)   Finally, Mr. Rich argues that even if the notice was delayed, such a finding makes no difference because of First

Mercury's continued position that the counterclaims asserted were not covered under the Policy. (ECF Nos. 20 at 14; 22 at 6.)   As a result of First Mercury's position, Mr. Rich asserts that First Mercury cannot plausibly claim prejudice because coverage would have been denied regardless when notice was given.   (ECF No. 22 at 6.)

In West Virginia, "[t]he satisfaction of the notice provision in an insurance policy is a condition precedent to coverage for the policyholder."   Syl. Pt. 1, *Travelers Indem. Co. v. U.S. Silica Co.*, 788 S.E.2d 286, 287 (W. Va. 2015).   Regarding prompt notice, the Supreme Court of Appeals has also stated the following:

> In cases which involve liability claims against an insurer, several factors must be considered before the Court can determine if the delay in notifying the insurance company will bar the claim against the insurer. The length of the delay in notifying the insurer must be considered along with the reasonableness of the delay. If the delay appears reasonable in light of the insured's explanation, the burden shifts to the insurance company to show that the delay in notification prejudiced their investigation and defense of the claim. If the insurer can produce evidence of prejudice, then the insured will be held to the letter of the policy and the insured barred from making a claim against the insurance company. If, however, the insurer cannot point to any prejudice caused by the delay in notification, then the claim is not barred by the insured's failure to notify.

Syl. Pt. 2, *Dairyland Ins. Co. v. Voshel*, 428 S.E.2d 542, 543 (W. Va. 1993).   While reasonableness is typically a question for the jury, where the delay is substantial or the proffered explanation for the delay is untenable, reasonableness may be determined by the court as a matter of law.   *Travelers*, 788 S.E.2d at 293.

Therefore, in West Virginia, a two-step approach determines whether delayed notice precludes coverage.   First, a reviewing court "must consider the length of the delay and whether the delay was reasonable."   *Id.* at 292.   If the delay is unreasonable, the inquiry ends, and coverage is precluded.   If the delay is reasonable, however, then the burden shifts to the insurer

to demonstrate prejudice from the delayed notice.   *Id.*   If the insurer is successful in demonstrating prejudice, then coverage will be foreclosed.   *Id.*   Yet, if the insurer is unsuccessful in demonstrating prejudice, then coverage will not be barred by the delayed notice.   *Id.*

The Policy establishes the following regarding notice:

As a condition precedent to the availability of coverage under this policy, an INSURED'S duties in the event of a CLAIM are as follows:

A.      If a CLAIM is made against any INSURED, the INSURED must give prompt written notice to [First Mercury.]

(ECF No. 15–19 at 23.)   "Prompt" is not defined by the Policy.   If not already made clear by the law of West Virginia, this clause establishes that notice is a condition precedent to coverage.

Of significance to this analysis is the relevant timeline of the Simoni Litigation.   On March 26, 2010, Dr. Simoni, through counsel, sent a demand letter to Mr. Rich.   (ECF No. 15–12.)   At some unknown point in time, Mr. Rich discovered the March 26 letter, but did not respond to it. (ECF Nos. 20 at 12; 21 at 9.)   Gary Rich was out of the country when the letter was received, and after discussing the letter with his personal counsel, was concerned about "any matters that might affect Dr. Simoni's credibility" in the Spelter litigation when the case was remanded from the Supreme Court of Appeals.   (ECF No. 20 at 11–12.)   Therefore, Mr. Rich did not respond to the letter.

Over a year later, on November 21, 2011, Dr. Simoni again sent a claim letter to Mr. Rich. (ECF No. 20–2.)   This letter included two draft complaints, which Dr. Simoni stated his intent to file in two county circuit courts to pursue "adequate compensation for the services [he] provided." (*Id.*)   Mr. Rich did not become aware of this letter until approximately December 19, 2011, as he was in Saudi Arabia.   (*See* ECF No. 20 at 12.)   Mr. Rich's personal counsel reviewed this letter

on December 21, and then discussed the letter with Mr. Rich on December 30.   (*Id.*)   After

discussing the letter with his counsel, Mr. Rich decided the best course of action would be to file

one complaint in federal court[6]  for a declaratory judgment, "so that the matters raised by Simoni

could be resolved in one case instead of two and in a forum of Mr. Rich's choice."   (*Id.* at 13.)

The declaratory judgment action was filed in the Northern District of West Virginia on January

13, 2012.   (*Id.*)

Dr. Simoni filed his counterclaim in the declaratory judgment action on April 16, 2012.

(ECF No. 21 at 9.)   Then, on April 27, 2012, Mr. Rich's counsel attempted to fax notice of the

counterclaim to First Mercury using the facsimile number as listed in the Policy.   (ECF No. 15–

13.)   However, the fax failed to transmit, as evidenced by the confirmation page.   (ECF No. 21–

1.)   Nothing further happened until October.

Then, on October 5, 2012, Dr. Simoni filed an amended counterclaim.   (ECF No. 21 at 9.)

Next, on November 5, Mr. Rich filed his answer to the amended counterclaim and simultaneously

filed the third-party claims against the third-party law firms.   (*Id.*)   On December 4, the third-

party law firms filed their answers and subsequent counterclaims against Mr. Rich.   (*Id.*)   Finally,

on February 28, 2013, Mr. Rich's counsel successfully notified First Mercury of the counterclaims,

which First Mercury acknowledged on April 29, 2013.   (*Id.*)

With this timeline established, the first task for the Court to conduct is determining whether

the delay was reasonable, which necessarily requires a determination of the delay itself.

*Travelers*, 788 S.E.2d at 293.   Under these specific facts, it cannot be disputed that notice of the

counterclaims against Mr. Rich was first received by First Mercury on February 28, 2013, when

---

[6] The draft complaints, which were to be filed in the Circuit Courts of Marion and Harrison counties, indicated that
Dr. Simoni was a resident of the State of Florida.   (ECF No. 20 at 13.)

the second notice was actually transmitted via facsimile.   Furthermore, while Mr. Rich—through his counsel—attempted to provide notice via facsimile on April 27, 2012, that failed attempt would not satisfy the notice provision under the Policy because the transmission never completed.[7]   The remaining piece to the length of the delay is determining when Mr. Rich first became aware of Dr. Simoni's claims against him.   Under the Policy, the date on which Mr. Rich first became aware of the claims must be March 26, 2010, when Dr. Simoni first sent Mr. Rich a letter outlining his claim for compensation.   (*See* ECF No. 15–12.)   The Policy defines a "claim" as "a demand made upon any INSURED for DAMAGES," (ECF Nos. 15–19 at 19; 17-2, Ex. 1-A at 6), which, by definition, the March 26 letter clearly meets.

This leaves a delay from March 26, 2010, to February 28, 2013, a period of almost three years.   In that time, Mr. Rich chose not to respond to Dr. Simoni for fear of hurting the relitigation of his case and instituted his own declaratory action against Dr. Simoni.   Only after Dr. Simoni actually filed the counterclaims on April 16, 2012, did Mr. Rich attempt to notify First Mercury of the claims asserted against him.   At the time Mr. Rich's counsel attempted to transmit the notice via fax, Mr. Rich had been aware of the potential claims for over two years.   Furthermore, as already discussed, the failed transmission of the notice—a matter that should have been realized by Mr. Rich's counsel as soon as the confirmation page was received—did not constitute notice under the Policy because First Mercury never received the notice.   It was not until February 28,

---

[7] For example, the county circuit courts in West Virginia state that "[a] facsimile copy of a pleading or other document shall be deemed filed *when it is received in its entirety* on a clerk's facsimile machine without regard to the hours of operation of the clerk's office."   W. Va. Trial Ct. R. 12.03(h) (emphasis added). The Trial Court Rules also establish that "[i]f there is an error in any facsimile transmission, the clerk shall not accept or note the document as filed until a corrected, acceptable document is received."   W. Va. Trial Ct. R. 12.03(m).

2013, nearly three years after Mr. Rich first became aware of the potential claims against him, that the notice of claims was successfully transmitted.

As a matter of law, such a delay is unreasonable.   *See Dairyland Ins. Co.*, 428 S.E.2d at 546 ("In this case, no explanation was given which would make an almost two-year delay appear reasonable.").   The unreasonableness of the delay is only bolstered by the explanations given by Mr. Rich.   First, Mr. Rich apparently argues that no notification was given to First Mercury in order to maintain a litigation advantage.[8]   Mr. Rich states, in addressing the March 2010 letter, that Dr. Simoni "would potentially be an important witness in a retrial of the Spelter litigation," and he was worried about anything that might affect Dr. Simoni's credibility.   (ECF No. 20 at 12.)   Similarly, after receiving the November 2011 letter and draft complaints, Mr. Rich decided to preemptively file a declaratory judgment action against Dr. Simoni in federal court.   (*Id.* at 13 ("[T]he best course of action would be to file a complaint for declaratory judgment . . . so that the matters raised by Simoni could be resolved in one case instead of two and in a forum of Mr. Rich's choice.").)   At best, this line implicitly acknowledges that Dr. Simoni had raised claims against Mr. Rich, which, in order to be covered, would need to be brought to First Mercury's attention. Instead, the takeaway from Mr. Rich's argument is that the need to create or maintain an advantage in the ongoing litigation outweighed the notice provision of the Policy, which was a condition precedent to coverage.   Mr. Rich, however, does not explain how notifying *First Mercury* would prejudice the Spelter litigation or prejudice his own position in preemptively filing an action for declaratory judgment.   Thus, the need to maintain or create an advantage in litigation cannot serve as an adequate explanation for a delay that was already around two years in length.

---

[8] The Court notes that, under the West Virginia Rules of Professional Conduct, Mr. Rich has an ethical obligation to be a zealous advocate of his client's position.   W. Va. Rules of Pro. Conduct, Preamble.

Next, Mr. Rich seemingly argues that First Mercury changed its facsimile number without notifying Mr. Rich. (*Id.*) *See also, supra*, n.3. Mr. Rich bases this on a letter from First Mercury's claims administrator that was sent on April 29, 2013, which lists a different facsimile number than the Policy. (*Id.*) However, in so arguing, Mr. Rich apparently ignores the fact that First Mercury actually received the second notice—which served to notify First Mercury of the third-party law firms' counterclaims—and was in fact acknowledging receipt of the second notice. (*See* ECF No. 17–3 at 1 ("We received notice of claim on March 13, 2013, via letter dated February 28, 2013 . . . .")). It should have been apparent that First Mercury did not in fact change its facsimile number when it acknowledged receipt of a notice of claim sent to the number provided in the Policy. This explanation thus also fails to explain the reasonableness of the three-year delay.

Finally, Mr. Rich argues that even if the notice was delayed, First Mercury cannot demonstrate any actual prejudice as a result of the delay because of First Mercury's position that the claims were not covered by the Policy. (ECF No. 20 at 13–14.) However, the Court need not address this argument, as it has already found that the delay was unreasonable. *Travelers Indem. Co. v*, 788 S.E.2d at 292 ("If the delay was not reasonable, the inquiry ends, and coverage will be foreclosed."). Only when the Court has found that the delay was reasonable under the circumstances does the burden shift to First Mercury to show prejudice as the result of the delay. Because the delay was unreasonable, First Mercury is not required to show prejudice. *See* Syl. Pt. 2, *Dairyland Ins. Co.*, 428 S.E.2d at 542.

As the law in West Virginia has clearly established, prompt notice of claims is a condition precedent to coverage under an insurance policy. Syl. Pt. 1, *Travelers Indem. Co. v*, 788 S.E.2d

at 287.   Because the nearly three-year delay in notifying First Mercury of the claims asserted against Mr. Rich was unreasonable such that compliance with the Policy's notice provision failed, so too does Mr. Rich's claim of a breach of the Policy by First Mercury.   For the foregoing reasons, First Mercury's motion for summary judgment, (ECF No. 15), is **GRANTED**.   For these same reasons, Mr. Rich's motion for summary judgment, (ECF No. 17), is **DENIED**.

## IV.   CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant First Mercury's Motion for Summary Judgment.   (ECF No. 15.)   The Court further **DENIES** Plaintiff Mr. Rich's Motion for Summary Judgment.   (ECF No. 17.)   Accordingly, this case is **DISMISSED** with prejudice. The Court **DIRECTS** the Clerk to remove this case from the Court's docket.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        August 27, 2020

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

26